UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
-------------------------------------------------------------X
PHILLIP CANINO, HARRY BALKE, and
MARION P. BALKE, individually and on behalf
of all others similarly situated,

                                    Plaintiffs,

            -against-                               **REPORT AND**
                                                    **RECOMMENDATION**
                                                    **04-CV-175 (RJD)**

UBS PAINEWEBBER, INC. and UBS
WARBURG, LLC,

                                    Defendants.
-------------------------------------------------------------X

**GOLD, S., U.S.M.J.:**

## INTRODUCTION

       Plaintiffs Phillip Canino and Harry and Marion Balke (collectively, the "Plaintiffs") bring this putative class action against UBS Painewebber, Inc. and UBS Warburg, LLC (collectively, the "Defendants"). Plaintiffs allege that the defendants violated Section 12(a)(2) of the Securities Act of 1933, 15 U.S.C. § 77*l*, by misstating or omitting material facts in the prospectuses of securities known as "GOALs" purchased by plaintiffs. More specifically, plaintiffs contend that GOALs pose the same investment risks as options but are not described as options in the prospectuses.

       Defendants have moved to dismiss pursuant to Federal Rule of Civil Procedure 12(b) based on the following grounds: 1) "plaintiffs fail[ed] to identify an actionable misstatement or omission," 2) statute of limitations, 3) no loss causation, 4) lack of standing, and 5) UBS Warburg is not a seller. Def. Mem. at 9.

The motion has been referred to me for report and recommendation by the Honorable Raymond J. Dearie.  Docket Entry 52.  On May 18, 2005, I heard oral arguments.  For the reasons stated below, I respectfully recommend that defendants' motion to dismiss be granted.

## BACKGROUND

In simplified terms, a GOAL is an investment which offers a high interest rate, but which ties repayment of the principal amount invested to the performance of an underlying company stock.[1]  A GOALs investor receives his principal in cash at maturity if the linked equity closes at a price at or above the initial price; otherwise, the investor receives a pre-set number of shares of stock in the linked company.  A GOALs(+) investor receives his principal in cash at maturity if the stock of the linked company never closed below a pre-set protection price.  An investor also receives his full principal if the stock closed below the protection price prior to the final valuation date but closed above the initial price on the valuation date.[2]  However, if either of these conditions are not met, the GOALs(+) investor receives none of his cash principal back at all, but is instead provided with a pre-set number of shares of the linked stock.

Plaintiffs in this case invested in GOALs and GOALs(+) linked to Home Depot, Cisco, Nokia, and Worldcom, all of which declined significantly by the valuation date.  Thus, plaintiffs received company stock in lieu of cash.  The value of the stock they received was substantially

---

[1] Plaintiffs purchased GOALs, securities linked to Cisco and Home Depot stock, and GOALs(+), securities linked to Nokia and Worldcom stock.  As indicated in the text, GOALs and GOALs(+) operate in a similar manner, but the right to return of principal is tied to different performance criteria of the underlying stock.  The difference between GOALs and GOALs(+) is immaterial for purposes of this motion.  For ease of reference, the term GOALs, unless otherwise specified, is used in this Report to include both types of securities.

[2] Stock is deemed to have closed below the protection price if it closed below the protection price on any two consecutive trading days prior to the maturity date of the investment.

less than the amount of their principal investment.

Each of the named plaintiffs purchased GOALs linked to Home Depot or Cisco stock on or about December 20, 2000. Compl. ¶¶ 7 and 8. The prospectuses for these two investments are virtually identical. Compare Def. Ex. 3 (Prospectus for GOALs linked to Home Depot stock) with Def. Ex. 4 (Prospectus for GOALs linked to Cisco stock.). Each states on the first page that the GOAL coupon is "composed of (1) an interest coupon representing a rate of 5% per annum and (2) a coupon representing an option premium of 9.125% per annum." Def. Ex. 3 and 4. These prospectuses explain payment at maturity on pages one, five, twenty-one, and twenty-two. Id. Each repeatedly warns investors of investment risks. Under the heading "SELECTED RISK CONSIDERATIONS," the prospectuses state

> An investment in GOALs involves significant risks . . . GOALs are exposed to the same downside price risk as the common stock . . . and do not provide protection of the principal. GOALs do not have the same price appreciation potential as the underlying stock. At maturity, the value of the GOALs cannot appreciate above their principal amount.

Def. Ex. 3 at 5-7. On page eight, in block capital letters, the prospectuses warn "THERE IS NO GUARANTEED RETURN OF PRINCIPAL, " "YOU CAN LOSE SOME OR ALL OF THE AMOUNT THAT YOU INVEST IN GOALs," "THE VALUE OF THE GOALs CANNOT EXCEED THE STATED PRINCIPAL AMOUNT AT MATURITY," "YOU MAY NOT HAVE AN ACTIVE TRADING MARKET IN THE GOALs," and "THE MARKET PRICE OF THE GOALs WILL BE INFLUENCED BY UNPREDICTABLE FACTORS." Def. Ex. 3.

Each of the plaintiffs also made a subsequent purchase of Nokia and/or Worldcom GOALs. Compl. ¶¶ 7 and 8. The prospectuses for these two investments are virtually identical to each other as well. Compare Def. Ex. 1 (Prospectus for GOALs linked to Nokia stock) with

Def. Ex. 2 (Prospectus for GOALs linked to Worldcom stock).[3] On the first page of each of these prospectuses, the terms by which payment at maturity is determined are set forth, as described above. Def. Ex. 1. Payment at maturity is discussed again on pages three and thirty-one. Id. Like the prospectuses for the Home Depot and Cisco GOALs, these prospectuses repeatedly warn of the potential for loss of principal. The prospectuses warn investors *five times* in the first five pages that they risk not receiving their full principal back at maturity. Id. Page eleven provides an example of a decreased return if the linked equity closes below the protection price. Id. Furthermore, the prospectuses specifically warn that an investor "may lose some or all of [his] principal" another five times throughout the first half of the prospectuses. Id. at 1-33. For example, under the section "Risk Factors," the prospectuses state, in capital letters separated from other text, "YOU MAY LOSE SOME OR ALL OF YOUR PRINCIPAL." Id. at 12.

Additionally, although the summary at the beginning of the Nokia prospectus describes GOAL investments as "equity linked notes," Def. Ex. 1 at 3, and not as a coupon "representing an option premium" as the Home Depot prospectus does, the Nokia prospectus, under the heading "Specific Terms of GOALS(+)," describes the coupon as representing interest at market rate and "an option premium." Def. Ex. 1 at 31. The prospectuses also refer to the option-like nature of a GOAL investment in a section addressed to tax consequences. All of the prospectuses state that the Internal Revenue Service treats a GOAL investment as comprising both "a non-contingent debt instrument" and "a put option." Def. Ex. 1 at 6 and 54; Def. Ex. 3 at 7 and 42-46. Each of the prospectuses also suggest that investing in GOALs is risky, stating that

---

[3]Because the Home Depot and Cisco prospectuses are virtually identical, and because the Nokia and Worldcom prospectuses are as well, for the sake of simplicity, this Report will generally refer to the Home Depot and Nokia prospectuses only.

4

"GOALs(+) may not be a suitable investment for you if: . . . [y]ou prefer the lower risk and . . . accept the potentially lower returns of fixed income investments. . . ." Def. Ex. 1 at 6. See also Def. Ex. 3 at 5.

## DISCUSSION

*Failure to State a Claim*

A court deciding a motion to dismiss for failure to state a claim must "accept[] all factual allegations in the complaint as true and draw[] all reasonable inferences in the plaintiffs' favor." Ganino v. Citizens Util. Co., 228 F.3d 154, 161 (2d Cir. 2000). Dismissal is appropriate "only if 'it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief.'" Harris v. City of New York, 186 F.3d 243, 250 (2d Cir. 1999) (quoting Conley v. Gibson, 355 U.S. 41, 45-46, 78 S.Ct. 99 (1957)).

Section 12(a)(2) of the Securities Act of 1933 (the "Act") provides for civil liability against "[a]ny person who . . . offers or sells a security . . . by means of a prospectus or oral communication, which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements . . . not misleading . . . ." 15 U.S.C. § 77*l*. To survive a motion to dismiss, a plaintiff alleging a violation of Section 12(a)(2) of the Act must establish that a prospectus contained a material omission or misstatement.

When considering whether a prospectus is misleading, courts charge reasonable investors with knowledge of all of the information a prospectus contains. Dodds v. Cigna Sec., Inc., 12 F.3d 346, 351 (2d Cir. 1993) (warnings which were clearly disclosed in the prospectuses were "sufficient to put a reasonable investor of ordinary intelligence on notice of the commissions, the risk, and the illiquidity of these investments"). Failure to read a prospectus will not excuse an

investor who alleges securities violations.  Id.  Furthermore, although a prospectus must use clear and plain language, plaintiffs cannot prevail by simply suggesting better language that should have been used.  See Kahn v. Wien, 842 F. Supp. 667, 675-76 (E.D.N.Y. 1994).  "[P]roxy solicitations need only provide the full objective facts upon which investors can make their own judgments as to value."  Id. at 676.  Only material omissions, which are those omissions that "arise from the absence of pivotal information affecting the nature and character of a specific investment opportunity, and the promises or threats of risk and return," are actionable.  Id. at 675.

Plaintiffs do not contend that the prospectuses affirmatively misrepresent the terms of GOAL investments, nor could they.  As stated above, the prospectuses clearly and accurately describe the mechanics of the investment contract.  Def. Ex. 1 at 1, 3, and 5; Def. Ex. 3 at 1, 5, and 21-22.  Any reasonable investor who reads the prospectuses would understand the nature and risks of an investment in GOALs.  Indeed, at oral argument, plaintiffs conceded that the prospectuses accurately describe the mechanics of the investment.  Tr. 54.

Rather, plaintiffs contend that GOALs are equivalent to put options and pose the same high level of risk to investors.  Plaintiffs further contend that the prospectuses misled them by failing to describe GOALs as options, and by suggesting instead that GOALs are debt instruments, which typically involve lower risk.  See Compl. ¶¶ 3, 28, 39-40.  Plaintiffs argue that the failure to describe GOALs as options goes to the nature and character of the investment, not just the label, and that the term "option" by itself carries special significance.  Pl. Opp. at 10-16; Tr. 55-57.

Plaintiffs' contention that GOALs and options pose equivalent investment risk is well-founded.  This may be seen by considering a hypothetical investment of $1000.  An investment

of $1000, and a guaranteed return of interest at market rates, is hardly a controversial or unusual investment; indeed, the interest merely reflects the market's valuation of the use of money over time. As noted above, however, the GOAL investor receives a rate of interest *above* the market rate. Clearly, this additional interest is awarded to the investor in return for assuming the risk that the stock of the linked equity – Nokia, for example – will fall below the protection price and not recover to its initial price by the valuation date.

Seen this way, the interest paid to the investor over and above the market interest rate is the equivalent of a payment to the investor for a put option. This is so because, at the end of the investment contract period, the purchaser of the security may be forced to accept devalued stock in lieu of return of principal. According to Characteristics and Risks of Standardized Options, a booklet written and published by The Options Clearing Corporation and which is provided to an investor prior to investing in options, "[a]n option is the right either to buy or to sell a specified amount or value of a particular underlying interest at a fixed exercise price by exercising the option before its specified expiration date." Ex. A, annexed to Farrell Decl. Simply stated, a put option gives the option holder the right to sell his interest. Id.

Defendants attempt to distinguish GOALs from put options by pointing out that, while the holder of an option may choose whether or not to exercise it, a GOAL involves no similar opportunity for choice. Def. Mem. at 17. Rather, the outcome to the investor is defined at the beginning of the investment period and controlled by the fluctuation in the market price of the linked equity. If the market price of the stock never goes below the protection price, or if the market price is greater than the initial price on the final valuation date, the investor receives his principal back; otherwise, the investor receives stock in lieu of return of principal.

Although the outcome of a GOAL is thus determined by market fluctuation and not the exercise of an option-holder's discretion, the GOAL functions in essentially the same way that the rational holder of an option would: if the price falls below a certain level, the "option" is exercised, and the investor is required to purchase the stock at a predetermined, higher price; if the price of the stock remains high, the "option" is not exercised and the investor retains his money or, in the case of a GOAL investor, receives his money back.

The problem with plaintiffs' claim is that, as described above, the prospectuses for the Home Depot and Cisco GOALs *do* in fact use the term "option" to describe at least one aspect of the investment. On the very first page of the prospectuses, a GOAL is specifically described as including a "coupon representing an option premium." Def. Ex. 3 and 4. Thus, the crux of plaintiffs' claim is undermined by the plain language of the Home Depot and Cisco prospectuses themselves.

Although the opening summaries of the Nokia and Worldcom prospectuses do not describe GOALs as including a coupon representing an option premium, the prospectuses later describe the GOAL coupon as comprised of an interest payment and an option premium. Def. Ex. 1 at 31. These prospectuses also refer to the option-like characteristics of the investment in a section devoted to tax consequences. Def. Ex. 1 at 6 and 54. A careful reader would thus be alerted to the fact that the coupon included an option premium, and that the Internal Revenue Service treats GOALs as combining "[a] non-contingent debt instrument" and "[a] put option" on the linked security. Def. Ex. 1 at 6; Def. Ex. 3 at 7. More importantly, each of the prospectuses, including the ones for GOALs linked to Nokia and Worldcom stocks, plainly and accurately set forth the terms of a GOAL investment, and explicitly warn the investor that he might lose some

8

or all of his principal.

Furthermore, the warnings of the risk of losing principal are numerous and clearly stated. Def. Ex. 1 at 4-12; Def. Ex. 3 at 5-10. The warnings are not buried; in fact, at times, the warning language is printed in block capitals and separated from the other text. See, e.g., Def. Ex. 1 at 4, 12; Def. Ex. 3 at 8. In addition, the Nokia and Worldcom prospectuses provide illustrations of possible results depending on the fluctuation in the price of the underlying stock, including an example where the stock decreases in value and an investor receives significantly less than the full amount of his principal back at the end of the investment period. Def. Ex. 1 at 8-11.

Even if the Nokia and Worldcom prospectuses were held to be misleading because they do not describe GOALs as including an option premium as clearly as the Home Depot and Cisco prospectuses do, plaintiffs' claims would fail. Section 12 imposes liability upon a seller of securities who uses a prospectus which includes untrue statements or omits material facts necessary to make the prospectus not misleading, "the purchaser not knowing of such untruth or omission." 15 U.S.C. § 77*l*(a)(2). As discussed above, each of the plaintiffs in this case purchased either the Home Depot or Cisco GOALs before investing in GOALs linked to Nokia or Worldcom stock, and thus were aware, by virtue of the disclosures in the Home Depot and Cisco prospectuses, that an investment in GOALs includes a coupon representing an option premium.

Plaintiffs dismiss much of the warning language in the prospectuses as boilerplate. Pl. Opp. at 19; Tr. 56. Many of the warnings, though, are quite specific, and there is no reason to think investors would ignore them as mere boilerplate. See Olkey v. Hyperion 1999 Term Trust, Inc., 98 F.3d 2, 5-6 (2d Cir. 1996) ("The plaintiffs seek to have all the cautionary language

disregarded as boilerplate, but it is too prominent and specific to be disregarded. The prospectuses warn investors of exactly the risk the plaintiffs claim was not disclosed. . . . [U]nder the heading 'Risk Factors,' the prospectuses even suggested the possibility of precisely the scenario that occurred. . . ."). In this case, for example, under a section entitled "WHAT ARE SOME OF THE RISKS OF GOALS(+)?," the Nokia prospectus states "If Nokia ADSs close below the protection price . . . prior to the final valuation date and Nokia ADSs close on the final valuation date below the initial price, you will not receive 100% of the principal amount of your GOALS(+) at maturity." Def. Ex. 1 at 5.

In addition to their primary contention that the prospectuses fail to describe GOALs as put options, plaintiffs more specifically argue that the prospectuses 1) fail to disclose "the risk that investors might misunderstand the complexity of their GOALs investments," 2) fail to warn that options investing involves a magnified risk as compared to investing in stocks, 3) fail to include information contained in brochures provided to European investors about whether a GOAL investment is appropriate for a particular individual, and 4) fail to explain clearly to investors the equity component of GOALs. Pl. Opp. at 10-15. Additionally, plaintiffs allege that the failure to provide information about the underlying companies was a material omission. Compl. ¶¶ 44-47; Pl. Opp. at 17, n.20.

The prospectuses, however, do provide much of the information which plaintiffs allege is missing. For example, the prospectuses indicate the complexity of a GOAL investment by warning that the "federal income tax consequences of [an] investment in GOALs is uncertain." Def. Ex. 1 at 6; Def. Ex. 3 at 7, 12. The prospectuses also warn of the significant risks in investing in GOALs, as discussed in detail above.

Additionally, the prospectuses provide information equivalent to that provided to European investors. For example, GOAL brochures for European investors state that a GOAL investment might be appropriate if an investor expects a flat market, accepts higher risk, wants to remain flexible, and actively monitors price performance. See Pl. Ex. B. Similarly, the GOAL prospectuses at issue in this case state that "GOALs(+) may be a suitable investment for you if: . . . you are willing to accept the risks" and "[y]ou believe [the underlying stock] will close at or above the initial price on the final valuation date or will not close below the protection price prior to the final valuation date." Def. Ex. 1 at 6. See also Def. Ex. 3 at 5. With respect to flexibility, the prospectuses explicitly warn, under the heading "LIQUIDITY," that "[t]here may be little or no secondary market for GOALs(+)." Def. Ex. 1 at 5. See also Def. Ex. 3 at 7. See Tr. 58-64.

Furthermore, the prospectuses clearly and accurately describe the equity component of GOALs. The prospectuses explicitly warn that "YOUR APPRECIATION POTENTIAL IS LIMITED," "YOU WILL NOT BENEFIT FROM ANY APPRECIATION IN NOKIA ADSS ABOVE THE INITIAL PRICE," and "YOU HAVE NO SHAREHOLDER RIGHTS. . . ." Def. Ex. 1 at 12-14 and 18. See also Def. Ex. 3 at 5-8 and 11. Lastly, the prospectuses provide some information about the underlying companies, such as a brief description of the company, historical prices of the stock, and where to obtain additional information. Def. Ex. 1 at 21-24; Def. Ex. 3 at 13-16. The prospectuses specifically warn that an investor "SHOULD UNDERTAKE SUCH INDEPENDENT INVESTIGATION OF [the linked company] AS . . . IS APPROPRIATE TO MAKE AN INFORMED DECISION WITH RESPECT TO AN INVESTMENT IN GOALs(+)." Def. Ex. 1 at 24. See also Def. Ex. 3 at 16. Thus, the material information that plaintiffs contend was omitted is actually contained in the prospectuses.

That plaintiffs might point to additional or more explicit cautionary language that might have been used is insufficient to state a claim where, as here, the prospectuses provide "the full objective facts upon which investors can make their own judgments as to value." Kahn, 842 F. Supp. at 676.  It may even be that the defendants, when they conceived of and marketed the Nokia and Worldcom investment vehicles, specifically deleted the references to "options" which appeared on the first page of the Home Depot and Cisco prospectuses, knowing that the term connotes risk and that options are subject to additional regulations.  See 17 C.F.R. § 239.20 (2005) (requiring a special registration form for options); 17 C.F.R. § 240.9b-1 (2005) (requiring brokers and dealers to provide an options disclosure document to potential investors); NASD Manual Rule IM-2860-2 (2005) (requiring brokers and dealers to conduct due diligence prior to opening investors' options accounts).  See also Pl. Ex. B (European brochure that explicitly describes GOALs as "a bond with a put option").  Nevertheless, plaintiffs have not cited a single case in which a court has found Section 12 liability for a failure to properly "label" a security.  To the contrary, courts have dismissed claims where the prospectuses provided complete explanations of the investments but failed to use the language that plaintiffs desired. See Sheppard v. TCW/DW Term Trust 2000, 938 F. Supp. 171, 174-76 (S.D.N.Y. 1996) (no liability for failure to describe investment as "exotic mortgage derivative" where risks of investments were "described in a detailed, intelligible manner").

For all the reasons stated above, I conclude that the prospectuses are not actionable under Section 12(a)(2) of the Securities Act because they contain sufficient information about the nature and risks of investing in GOALs so as not to be misleading.  See Kahn, 842 F. Supp. at 675.

*Statute of Limitations*

Defendants also move to dismiss on the ground that plaintiffs' claims are barred by the statute of limitations. Even if I were to find that the complaint sufficiently alleges a Section 12 claim, I would recommend that the action be dismissed as time-barred.

Although not raised by the parties, the first question to resolve is what statute of limitation applies. Under the Securities Act of 1933, a claim must be brought "within one year after the discovery of the untrue statement or omission, or after such discovery should have been made by the exercise of reasonable diligence," and in any event no later than three years after the sale. 15 U.S.C. § 77m. Effective July 30, 2002, the Sarbanes-Oxley Act extended the statute of limitations for securities law claims of "fraud, deceit, manipulation, or contrivance" to "two years after the discovery of the facts constituting the violation." 28 U.S.C. § 1658(b)(1). The Second Circuit has not yet ruled on whether Sarbanes-Oxley's extended statute of limitations applies to Section 12 claims, such as those brought in this case, which do not require a showing of fraud. It appears, however, that no other court has applied the longer statute of limitations period in Sarbanes-Oxley to a Section 12 claim. See, e.g., In re Firstenergy Corp. Sec. Litig., 316 F. Supp. 2d 581, 601 (N.D. Ohio 2004) ("Since fraud is not a required element for claims under §§ 11 or 12(a)(2), the Court concludes that Sarbanes-Oxley Act does not extend the limitations period for these claims."); In re Enron Corp. Sec., Derivative & "ERISA" Litig., 2004 WL 405886, *12 (S.D. Tex. Feb. 25, 2004) (finding that the Sarbanes-Oxley Act does not apply to Section 11 and 12 claims based on negligence or strict liability); In re Worldcom, Inc. Sec. Litig., 294 F. Supp. 2d 431, 440-44 (S.D.N.Y. 2003); In re Merrill Lynch & Co., Inc. Research Reports Sec. Litig., 272 F. Supp. 2d 243, 265 (S.D.N.Y. 2003). During oral arguments, plaintiffs

specifically disavowed any reliance on Sarbanes-Oxley and acknowledged that their current complaint is not based on fraud. Tr. 38-41. Therefore, the one-year statute of limitations period of the Securities Act applies here.

The next question is when the limitations period began to run in this case. Plaintiffs filed this action on January 15, 2004. Accordingly, plaintiffs' claims are timely only if they accrued on or after January 15, 2003.

In securities litigation, determining the trigger date for the statute of limitations involves two steps. First, "when the circumstances would suggest to an investor of ordinary intelligence the probability that she has been defrauded, a duty of inquiry arises, and knowledge will be imputed to the investor who does not make such an inquiry." Dodds, 12 F.3d at 350. The circumstances triggering a duty of inquiry are often referred to as "storm warnings." Levitt v. Bear Stearns & Co., Inc., 340 F.3d 94, 101 (2d Cir. 2003). Second, once a plaintiff receives "storm warnings" placing him on inquiry notice, the statute of limitations is triggered "'*when*, after obtaining inquiry notice,' the plaintiff 'in the exercise of reasonable diligence, should have discovered the facts underlying the [defendant's] alleged fraud.'" Id. (emphasis in original) (quoting Rothman v. Gregor, 220 F.3d 81, 97 (2d Cir. 2000)). Thus, the claims asserted in this case accrued when an ordinary investor would have discovered that the prospectuses were misleading because they did not clearly reveal the nature and risks of investing in GOALs.

Defendants argue that plaintiffs were on inquiry notice as of the date the prospectuses were issued because the prospectuses warned investors of the potential loss of their money.[4] Def.

---

[4]The prospectuses were issued between January 18, 2001 and January 30, 2002. Def. Ex. 1-4 at 1.

Mem. at 27-28; Def. Reply at 6, n.5. See Dodds, 12 F.3d at 350-51 (finding that the risk warnings in the prospectuses were "sufficient to put a reasonable investor of ordinary intelligence on notice"). Although some courts have held the limitations period begins at the time the investment is made, I do not find that argument persuasive here. The gist of plaintiffs' claim is that the prospectuses failed to disclose the option-like risks of investing in GOALs. Assuming the viability of this claim for purposes of the limitations analysis, it defies logic to argue that a prospectus which misleadingly omits material information puts a plaintiff on notice of a claim that this material information was not communicated.

Defendants contend in the alternative that the statute of limitations began to run in July and August of 2002, when the determination dates for Cisco and Home Depot GOALs passed and plaintiffs received devalued shares of stock in lieu of their principal. Def. Mem. at 28-29. Plaintiffs' claim in this case is that, by failing to describe GOALs as options, defendants failed to alert plaintiffs to the risk that their principal would be lost, wholly or in part, if the market price of the linked equity dropped. Indeed, while plaintiffs contend they were misled by the prospectuses to underestimate their risk and to think of their investments as relatively safe debt instruments, they lost 40 to 60% of their principal when they received the devalued Cisco and Home Depot stock. Compl. ¶¶ 56 and 59. If, even after reading the prospectuses, plaintiffs were in fact unaware that their investments posed a significant risk of loss of principal, the significant losses they incurred would certainly have brought those risks to their attention. See, e.g., In re Merrill Lynch & Co., Inc., 273 F. Supp. 2d 351, 389 (S.D.N.Y. 2003) (holding that a dramatic decline in stock price was sufficient to trigger inquiry notice); de la Fuente v. DCI Telecomm., Inc., 206 F.R.D. 369, 383 (S.D.N.Y. 2002) (recognizing that "a drop in stock price alone is

15

insufficient" as a storm warning, but finding that the circumstances taken as a whole show inquiry notice). Thus, the receipt of the devalued shares in August, 2002 was sufficient to place plaintiffs on inquiry notice.[5]

Plaintiffs concede that losing their principal and instead receiving devalued Cisco and Home Depot shares at the end of the investment period might reasonably be argued to have put them on inquiry notice. Pl. Opp. at 35; Tr. 42-43 and 50-51. Plaintiffs, however, did not bring this action until January 14, 2004, one year and five months after they received the devalued Cisco and Home Depot shares in lieu of their principal. Plaintiffs attempt to justify this additional time by arguing that the loss of principal, in and of itself, was insufficient to alert them to the facts giving rise to a securities law violation, the second step in the limitations analysis. Pl. Opp. at 35; Tr. 42-43 and 50-51.

As noted above, even after a plaintiff is on inquiry notice, the limitations period is not triggered until the plaintiff, exercising reasonable diligence, should have discovered the facts giving rise to his claim. Levitt, 340 F.3d at 101. However, even if some period of time after plaintiffs incurred their losses was necessary to uncover facts constituting a securities law violation, plaintiffs offer no reason to think that five months was needed. Assuming, for example, that plaintiffs no longer had the prospectuses in their possession and that it took some time to obtain them, it seems clear that, once plaintiffs read the prospectuses, they should have realized that they had a claim either because they believed that GOALs and their risks were not

---

[5]Cisco and Home Depot GOALs matured on July 23, 2002 and August 15, 2002 respectively. See Def. Ex. 3 and 4. Although Nokia and Worldcom GOALs matured later, each plaintiff named in the complaint purchased either Cisco or Home Depot GOALs. Compl. ¶¶ 7 and 8.

16

accurately described in the prospectuses or, although discussed, were not properly highlighted. Indeed, during oral arguments, I asked plaintiffs to explain why they claim to have needed at least five months after incurring their losses to discover the facts underlying their claim, but plaintiffs failed to provide any explanation or to identify any additional information which was obtained or any event which took place only five months after the first investments matured and plaintiffs sustained their initial losses. Tr. 42-47.

Plaintiffs argue that the amount of time and diligence required to discover facts giving rise to a securities law violation is fact-specific, and therefore inappropriate for determination on a motion to dismiss. Pl. Opp. at 34-35. Plaintiffs rely on two cases that suggest that the determination of inquiry notice is fact-specific. Id. at 34-35. See In re Dreyfus Aggressive Growth Mut. Fund Litig., 2000 WL 10211, *3 (S.D.N.Y. Jan. 6, 2000) (finding that "the issue of constructive knowledge and inquiry notice should more properly be resolved by the trier of fact at a later stage in this litigation"); In re Prudential Sec. Inc. Ltd P'ships Litig., 930 F. Supp. 68, 76 (S.D.N.Y. 1996). See also Levitt, 340 F.3d at 101-103. In Prudential, the Court denied summary judgment on the limitations issue based on the "difficulty in uncovering" the extent of the scheme. 93 F. Supp. at 76. Dreyfus similarly involved claims which could not be discerned from available documents, including one based upon self-dealing by a fund manager. 2000 WL 10211, at *1. Although the Second Circuit in Levitt likewise recognized that the case was "not a typical storm warnings case," the Court distinguished cases such as this one "where Plaintiffs could allege a prima facie case against [the defendants] simply by examining [publicly available documents]." 340 F.3d at 103. Thus, although the question of constructive notice may often not be subject to determination on a motion to dismiss, that is not inevitably so. Rather, "[w]here . . .

the facts needed for determination of when a reasonable investor of ordinary intelligence would have been aware of the existence of fraud can be gleaned from the complaint and papers . . . integral to the complaint, resolution of the issue on a motion to dismiss is appropriate." LC Capital Partners, LP v. Frontier Ins. Group, Inc., 318 F.3d 148, 156 (2d Cir. 2003) (quoting Dodds, 12 F.3d at 352, n.3).

In the present case, plaintiffs' claims are based solely on the alleged inadequacy of the warnings set forth in a document that was in their possession when they made their investments. Plaintiffs have failed to explain why the nature of the inquiry they needed to undertake raises fact-specific questions, or why that inquiry could not be conducted, once the allegedly undisclosed risks resulted in losses, simply by reviewing the prospectuses themselves. Moreover, the question presented is not what plaintiffs in this case knew or what inquiry they undertook, but rather the objective question of when a reasonable investor would have been put on notice. See Dreyfus, 2000 WL 10211, at *3. Finally, "[o]nce the facts on the face of the complaint and related documents give rise to a duty of inquiry, it is appropriate to require a plaintiff, resisting a motion to dismiss on limitation grounds, at least to allege that the inquiry was made." LC Capital, 318 F.3d at 156. Plaintiffs have not come forward with any assertion that they made an inquiry, much less what type of inquiry they undertook or why it took five months to complete it. Tr. 50-51. For all these reasons, plaintiffs' complaint should be dismissed as time-barred.

*Leave to Amend*

If the district court adopts my Recommendation that the complaint be dismissed for failure to state a claim because the prospectuses were not misleading or did not omit any material

fact, I further recommend that the dismissal be with prejudice, because no amendment could cure the complaint. If, however, the district court adopts this Report and Recommendation with respect to the statute of limitations issue, but declines to hold that plaintiffs have failed to state a claim of Section 12 liability, I would recommend that the action be dismissed without prejudice and that leave to amend be granted. If plaintiffs amend the complaint to plead a claim of fraud, and if plaintiffs are able to establish that this new fraud claim relates back to the original complaint, their claim might arguably be timely under the two-year limitations period provided for securities fraud claims under the Sarbanes-Oxley Act.

*Remaining Issues*

Because I recommend that plaintiffs' complaint be dismissed for failure to state a claim and as time-barred, I do not reach defendants' remaining arguments in support of dismissal.

## CONCLUSION

For all these reasons and those stated during oral argument, I respectfully recommend that defendants' motion to dismiss be granted. Any objections to the recommendations made in this report must be filed with the Clerk of the Court and the Chambers of the Honorable Raymond J. Dearie within ten days of receiving this Report and Recommendation and, in any event, on or before August 11, 2005. Failure to file timely objections may waive the right to appeal the District Court's Order. See 28 U.S.C. § 636(b)(1); FED. R. CIV. P. 6(a), 6(e), 72; Small v. Secretary of Health & Human Servs., 892 F.2d 15, 16 (2d Cir. 1989).

                                                  /s/
                                      **STEVEN M. GOLD**
                                      **United States Magistrate Judge**

Brooklyn, New York
July 21, 2005